1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA,                No.  2:05-cr-0128 MCE AC

12              Plaintiff,

13        v.                                   FINDINGS AND RECOMMENDATIONS

14   JAMES S. KALFSBEEK,

15              Defendant.

16

17        Petitioner James S. Kalfsbeek is a federal prisoner who seeks relief under 28 U.S.C. §

18   2255 from his conviction for conspiracy, mail fraud, wire fraud, and money laundering.  The §

19   2255 motion was filed in pro per on August 16, 2012.  ECF No. 432.  The government answered,

20   ECF No. 438, and petitioner filed a traverse, ECF No. 448.  The parties filed supplemental briefs

21   at the request of the court.  ECF No. 461, 464.  On November 5, 2013, the undersigned ordered a

22   limited evidentiary hearing and appointed counsel to represent petitioner at that hearing.  ECF

23   No. 466.  The evidentiary hearing was held on March 9, 2015.  ECF No. 493.  Upon

24   consideration of the evidence presented at the hearing, and review of the record as a whole, the

25   undersigned recommends that the § 2255 motion be denied.

26                        FACTUAL AND PROCEDURAL BACKGROUND

27        The Puget's Sound Agricultural Society Ltd. ("PSASL") was a self-described Christian-

28   based organization that sold a pseudo-insurance product to members.  PSASL advised its

1

members that state insurance codes "are binding on commercial entities only, and are not binding on we the people, not being engaged in commerce."  PSASL purported to provide a legal "self-insurance" alternative to automobile liability insurance.  After paying a one-time membership fee of $500, members paid $250 per vehicle for enrollment in the Financial Responsibility program.  Enrollment entitled members to coverage for damages arising from car accidents, with significant limitations.[1]  On a quarterly basis, PSASL totaled all claims and assessed members an additional amount necessary to pay the claims.  PSASL was not licensed to sell insurance, and its Financial Responsibility product did not comply with the financial responsibility requirements of the states in which it was sold.

Petitioner James S. Kalfsbeek was a founder of PSASL and its original president and secretary, as well as a member of the Board of Directors.  By superseding indictment filed on June 23, 2005, eight individuals including petitioner were charged with thirty-three counts of conspiracy, mail fraud, wire fraud, money laundering and related charges arising from operation of PSASL.  Petitioner and co-defendant Donna Rowe ultimately proceeded to trial.  Trial began on May 20, 2009 and concluded on June 10, 2009.  The government presented evidence regarding PSASL's business and accounting practices, expert testimony regarding insurance regulation, and evidence of consequences of the program for members and third parties as follows.

PSASL member John Wesley Wood was involved in a single-car accident that killed one of his passengers and permanently disabled another.  When the injured parties sued the driver, he tendered his PSASL financial responsibility document.  Kalfsbeek returned the driver's tender of defense letter with the following language stamped in ink:  "Accepted for value.  This property is exempt from levy.  Please adjust this account for the proceeds, accounts and fixtures and release the order(s) to me immediately."  Eventually, the estates of the passengers obtained a $20 million default judgment against PSASL in Michigan, and registered the judgment in the Northern District of California.  Kalfsbeek responded to attempts to collect by tendering a document titled

---

[1]  The following were excluded: damages arising from accidents involving alcohol or drug use (including prescription medication use) by drivers, damages arising from driver recklessness, damages for pain and suffering, and attorneys' fees.

"Bill of Exchange."  The magistrate judge in the Northern District repeatedly advised petitioner that the "Bill of Exchange" was a false financial instrument that could subject him to criminal charges.

PSASL member Rubin Dandridge rear-ended a moped driver who died of his injuries.  PSASL refused to cover damages.  The victim's son incurred $30,000 in uncompensated medical bills and funeral expenses.

PSASL member Melvin Shrock had been unable to find affordable legitimate insurance because of a history of accidents and DUI.  (PSASL did not inquire into the driving histories of its members.)  Shrock ran over a bicyclist, causing severe internal injuries.  PSASL told Shrock that it was his own responsibility to gather and submit documentation of damages.  The victim obtained counsel, who contacted PSASL and was told to deal directly with Shrock.  The victim eventually obtained a $20,000 default judgment against Shrock and PSASL.  PSASL eventually paid $6,000, the victim's actual medical costs.

The government presented evidence of numerous other PSASL members whose claims were delayed or denied, who were personally sued for damages that PSASL did not cover, who lost their driving privileges because they were not properly insured, and some of whom were penalized when it was discovered that they did not have valid insurance.  When members complained to PSASL, they were advised to challenge the "venue" of state DMV offices, and to respond in court with Bible verses and common law quotations provided by PSASL.  PSASL received cease and desist orders from sixteen states and two Canadian provinces.  Kalfsbeek generally responded to the cease and desist orders with reply documents bearing the stamp, "Accepted for value.  This property is exempt from levy."

The government presented evidence that PSASL moved its funds from California to Canada in order to avoid collection proceedings following the $20 million default judgment against it in Michigan.  The money in the Canadian account was subsequently transferred into a trust and immediately dispersed to the defendants individually.  Kalfsbeek made false statements about the Canadian account during debtor's examinations in the Northern District of California.

The defense presented no evidence.

3

On June 10, 2009, the jury found petitioner guilty on all counts.[2]  On February 23, 2010, he was sentenced to 120 months imprisonment.[3]

Petitioner appealed the sufficiency of the evidence as to the money laundering counts, and raised procedural challenges to his sentencing.  The Court of Appeals affirmed the judgment on March 5, 2012.  ECF No. 429.  Petitioner filed his motion under § 2255 on August 16, 2012. ECF No. 432.

## LEGAL STANDARDS

A federal prisoner making a collateral attack against the validity of his or her conviction or sentence must do so by way of a motion to vacate, set aside or correct the sentence pursuant to 28 U.S.C. § 2255, filed in the court which imposed sentence.  Tripati v. Henman, 843 F.2d 1160, 1162 (9th Cir. 1988).  Under § 2255, the district court may grant relief if it concludes that a prisoner in custody was sentenced in violation of the Constitution or laws of the United States. United States v. Barron, 172 F.3d 1153, 1157 (9th Cir. 1999).  Both the grounds for relief and the scope of the remedy in a § 2255 proceeding are identical to those available to state prisoners under § 2254, the federal habeas corpus statute.  Davis v. United States, 417 U.S. 333, 343-44 (1974).  To warrant relief, a petitioner must demonstrate the existence of an error which had a substantial and injurious effect or influence on the verdict.  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); see also United States v. Montalvo, 331 F.3d 1052, 1058 (9th Cir. 2003) (Brecht standard applies to habeas cases brought under § 2255 just as it does to those under § 2254), cert. denied, 541 U.S. 1011 (2004).

A court should hold an evidentiary hearing on a § 2255 motion "unless the files and records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. § 2255(b).  "In determining whether a hearing and findings of fact and conclusions of law are required, '[t]he standard essentially is whether the movant has made specific factual allegations that, if true, state a claim on which relief could be granted.'"  United States v. Withers, 638 F.3d 1055, 1062 (9th Cir. 2011) (quoting United States v. Schaflander, 743 F.2d 714, 717 (9th Cir.

---

[2]  Counts 1, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 21, 21, 22, 23, 31, 32, 33, and 34.
[3]  The prosecutor and probation officer both recommended a sentence of 235 months.

1  1984)).  Accordingly, no evidentiary hearing is needed "if [petitioner's] allegations, when viewed

2  against the record, do not state a claim for relief or are so palpably incredible or patently frivolous

3  as to warrant summary dismissal."  United States v. Leonti, 326 F.3d 1111, 1116 (9th Cir. 2003)

4  (citing Schaflander, 743 F.2d at 717) (quotations omitted)).  Conclusory statements in a § 2255

5  motion are insufficient to require a hearing.  United States v. Johnson, 988 F.2d 941, 945 (9th Cir.

6  1993).

7                      INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

8      I.      Petitioner's Allegations

9        Petitioner claims that his trial counsel, Scott Tedmon, provided deficient representation by

10  (1) failing to properly prepare and present a defense, (2) failing to request or negotiate a plea

11  bargain, (3) failing to exclude prejudicial evidence regarding "sovereign citizenship" and related

12  political beliefs and philosophies, and (4) failing to exclude testimony that petitioner had lied in

13  relation to a separate court proceeding.  ECF No. 432 at 4, 13-15.

14        Petitioner first alleges in general terms that counsel conducted no research or

15  investigations, completely failed to prepare for trial, and had no defense strategy whatsoever.  Id.

16  at 14.  He makes no allegations regarding specific legal theories, evidence, or strategies that were

17  available, would have been discovered by reasonable effort, and would have led to a different

18  result.  Petitioner also complains in general terms that counsel failed to object to evidence.  Id. at

19  15.  The only specific allegations regarding deficient performance focus on (1) counsel's failure

20  to challenge the government's evidence regarding the "sovereign citizenship" movement, and

21  corollary failure to establish that petitioner did not share the beliefs of that movement; and (2)

22  counsel's failure to object to testimony by an unspecified witness that petitioner had lied to the

23  court.  Id. at 13-15.

24        In his § 2255 motion, petitioner alleges that Mr. Tedmon failed to "contact the

25  government about obtaining an offer for plea bargain and conducted no negotiations on

26  Defendant's behalf to obtain a reasonable offer."  Id. at 14.  He alleges that he would have

27  accepted "any reasonable offer with less prison time," and that "at a minimum, Defendant would

28  have pleaded guilty to the charges in the superseding indictment and received credit for his

5

1  acceptance of responsibility." Id.  In his supplemental brief, supported by a supplemental

2  declaration, petitioner represents that he learned for the first time from the government's response

3  to his § 2255 motion that a plea offer had in fact been made.  He alleges that Mr. Tedmon failed

4  to communicate this offer to him.  ECF No. 464 at 2-3, 9-10.[4]  In light of the court's obligation to

5  liberally construe the pleadings of a pro per prisoner, see United States v. Seesing, 234 F.3d 456,

6  462-63 (9th Cir. 2000), the court accepts the allegations of the supplemental brief as an

7  amendment to the § 2255 motion.

8          II.       Governing Legal Principles

9          To establish a constitutional violation based on ineffective assistance of counsel, a

10  petitioner must show (1) that counsel's representation fell below an objective standard of

11  reasonableness, and (2) that counsel's deficient performance prejudiced the defense.  Strickland v.

12  Washington, 466 U.S. 668, 692, 694 (1984).  In evaluating counsel's performance, the court must

13  apply a strong presumption that counsel's representation fell within the wide range of reasonable

14  professional assistance.  Strickland, 466 U.S. at 689.  Prejudice means that the error actually had

15  an adverse effect on the defense.  There must be a reasonable probability that, but for counsel's

16  errors, the result of the proceeding would have been different.  Id. at 693-94.  A reasonable

17  probability is a probability sufficient to undermine confidence in the outcome.  Id.  The court

18  need not address both prongs of the Strickland test if the petitioner's showing is insufficient as to

19  one prong.  Strickland, 466 U.S. 668 at 697.  "If it is easier to dispose of an ineffectiveness claim

20  on the ground of lack of sufficient prejudice, which we expect will often be so, that course should

21  be followed."  Id. at 689.

22          The failure to communicate a favorable plea offer constitutes unreasonable performance

23  within the meaning of Strickland.  Missouri v. Frye, 132 S.Ct. 1399, 1408 (2012).  Unreasonable

24  advice that causes a favorable offer to be rejected also violates Sixth Amendment standards.

25  Lafler v. Cooper, 132 S.Ct. 1376 (2012), see also United States v. Rivera-Sanchez, 222 F.3d

26  ────────────────────

27  [4]  Petitioner declares both that "to this day, I am unaware of the exact terms and conditions of the Government's plea offer," and that Mr. Tedmon recently provided him with a "proposed global settlement" that included a 37-month sentence for petitioner, which he was "willing to accept."

28  ECF No. 464 at 9, 10.

1057, 1060 (9th Cir. 2000) (relief available if plea offer communicated insufficiently under prevailing professional standards, and client would have accepted offer had it been communicated sufficiently).  In either case, the petitioner must establish a reasonable likelihood that both he and the court would have accepted the proposed deal.  <u>Lafler</u>, 132 S.Ct. at 1389.  If prejudice is thus established, the remedy is an opportunity for discretionary resentencing rather than specific performance of the forfeited plea bargain.  <u>Id.</u>

If the court finds that petitioner's allegations are sufficient to support both prongs of the <u>Strickland</u> test, "a district court must grant a hearing to determine the validity of a petition brought under section 2255, '[u]nless the motions and the files and records of the case conclusively show that the prisoner is entitled to no relief.'"  <u>United States v. Blaylock</u>, 20 F.3d 1458, 1465 (9th Cir. 1994) (quoting 28 U.S.C. § 2255).  In other words, an evidentiary hearing is required if (1) a petitioner alleges specific facts, which, if true would entitle him to relief; and (2) the petition, files, and record of the case cannot conclusively show that the petitioner is entitled to no relief.  <u>United States v. Howard,</u> 381 F.3d 873, 877 (9th Cir. 2004).  No hearing is necessary if the petitioner's allegations, viewed against the record, fail to state a claim for relief or "are so palpably incredible or patently frivolous as to warrant summary dismissal."  <u>United States v. McMullen</u>, 98 F.3d 1155, 1159 (9th Cir. 1996), <u>cert. denied</u>, 520 U.S. 1269 (1997); <u>see also</u> <u>Howard</u>, 381 F.3d at 879 (bald, conclusory or inherently incredible allegations do not support a hearing).

III.    <u>Findings of Fact Regarding Plea Negotiations</u>

On March 9, 2015, the undersigned held an evidentiary hearing on the limited issue of counsel's performance in plea negotiations.  ECF No. 493.  Christian Highsmith appeared on behalf of the United States.  Timothy E. Warriner appeared on behalf of Mr. Kalfsbeek.

The hearing was ordered to resolve a specific and narrow factual question.  As noted above, petitioner has claimed both that trial counsel Scott Tedmon failed to seek a favorable plea bargain and that he failed to communicate a favorable plea offer.  On February 5, 2009, Mr. Tedmon filed a status report with Judge Karlton which represented *inter alia* that counsel had had several conversations with petitioner regarding settlement offers from the government.  ECF No.

461-1 at 2.  Petitioner's declaration dated October 17, 2013, denies that Mr. Tedmon ever

communicated a plea offer.  ECF No. 464 at 9-10.  An evidentiary hearing was ordered to resolve

the issue.  ECF No. 466.

Petitioner and Mr. Tedmon both testified at the hearing, and documents from Mr.

Tedmon's case file were received in evidence.  Having considered the testimony of the witnesses

and observed their demeanor,[5] and having reviewed the exhibits of the parties, the undersigned

makes the following findings of fact:

1.  Mr. Tedmon was appointed to represent Mr. Kalfsbeek in July of 2005.  Tedmon

    obtained petitioner's release from pre-trial custody, and they enjoyed a positive

    attorney-client relationship until approximately May of 2008.

2.  On November 16, 2007, Assistant U.S. Attorney Steven Lapham sent an email to Mr.

    Tedmon which read in relevant part:

    > Now that I am relatively trial-free for the near term, I have turned
    > my attention to this beast of a case.  I have a plan for resolving the
    > whole case that I think might sell with the other defendants but I'm
    > not sure about your guy given his anti-government views, which
    > seem more firmly entrenched than the others.  Is he receptive at this
    > point or would we be wasting our time?  The guidelines are
    > potentially in the stratosphere but I think I can get him down to a
    > range that is reasonable if he's willing to plead guilty.  If you think
    > he would entertain an offer, why don't you give me a call and I'll
    > tell you what I'm thinking.

    Plaintiff's Ex. 1.

3.  Tedmon let Lapham know, in general terms, that he was interested in exploring

    settlement possibilities.  See Plaintiff's Ex. 2 (log documenting November 2007 phone

    calls).  There were no substantive settlement negotiations at this time.  Lapham did not

    convey or suggest any specific plan for resolving the case, he merely indicated a

---

[5] Mr. Tedmon's testimony was credible overall.  His memory was clear and consistent with the
documentary record, and his testimony was internally consistent.  His demeanor supported a
positive credibility finding.  Mr. Kalfsbeek's testimony was unreliable.  He appeared sincere in
his beliefs, but his memory was unclear and frequently inconsistent with the documentary record.
His testimony was internally contradictory.  His demeanor cast doubt on the accuracy of his
memory.

4. general interest in doing so.  The interest was mutual, but no potential terms were discussed.

5. In January of 2008, the defense lawyers met as a group and confirmed that all were interested in seeing whether a global settlement could be negotiated.  John Balazs, counsel for petitioner's co-defendant Amy Polnoff, agreed to take the lead on crafting a proposal to present to Mr. Lapham.

6. On January 17, 2008, Mr. Balazs emailed the other defense lawyers to report on the status of his communications with Mr. Lapham.  He reported that "Steve said he would 'SERIOUSLY' consider any global settlement proposal if it contained 2 conditions: (1) any proposal would have to have a commitment from each of the defendants that they would take the deal; (2) any proposal does not do 'serious violence' to the guidelines, i.e., we could sell it to probation and LKK."  Lapham had emphasized the "stratospheric guidelines in this case," and felt most strongly about prison terms for defendants Kalfsbeek and Amy Polnoff.  See Plaintiff's Ex. 3 (Balazs email).

7. As of January 17, 2008, there had been only general discussion about the possibility of a plea bargain.  There had been no substantive negotiations between the prosecution and defense, and there were no concrete proposals from either side on the table.

8. In late February, Balazs drafted a memo for the other defense lawyers containing his notes of Lapham's position, Balazs's thoughts about possible Guidelines scoring, and a "possible global settlement proposal idea."  The proposal included 37-month prison terms for Kalfsbeek and Amy Polnoff.  See Plaintiff's Ex. 4 (Balazs memo).

9. Tedmon made handwritten notes on his copy of the Balazs memo, including a theory for reducing Kalfsbeek's sentence to 24 months.  Plaintiff's Ex. 4, p. 2.

10. On February 27, 2008, Tedmon and Kalfsbeek met at Tedmon's office.  They discussed matters including petitioner's interest in a global settlement, as reflected in Tedmon's contemporaneous notes of the meeting.  Plaintiff's Ex. 5 (handwritten notes); see also Ex. 7 (Out-of-Court Hourly Worksheet).  Petitioner had previously

9

indicated to Tedmon that he had no interest in pleading guilty.  Tedmon told petitioner

about the meeting with other defense lawyers regarding a possible global settlement,

and asked whether petitioner was interested.  Petitioner did not respond one way or the

other, but did ask questions and express various concerns about the consequences of a

plea.  Tedmon made notes of petitioner's questions and concerns, including a note to

check out whether petitioner would lose his Social Security benefits if he went to

prison.  Plaintiff's Ex. 5, p. 2.  Tedmon and petitioner scheduled another meeting for

March 11, 2008.  Id.

11. On March 4, 2008, Tedmon met with Balazs to discuss their ideas for a global

settlement.  Following the meeting, Balazs revised his proposal to reflect a possible 24

month sentence for petitioner.  Plaintiff's Ex. 6, p. 2 ("Potential Global Settlement

Outline").  Balazs sent a copy of the revised draft proposal to Tedmon, referring to it

as a "global proposal sheet we could give to Steve Lapham."  Plaintiff's Ex. 6, p. 1.

12. Petitioner could not make the March 11 meeting with Tedmon, so they spoke on the

phone.  Tedmon reported on the idea for a 24 month sentence that was under

discussion among the defense lawyers.  Petitioner rejected the idea.  Tedmon's Out-of-

Court Hourly Worksheet contains the following entry for March 11, 2008: "Tel w/

client re: defense offer, client not interested and wants to go to trial."  Plaintiff's Ex. 7.

13. On March 17, 2008, Tedmon told the other defense lawyers that his client had rejected

the settlement proposal that was under discussion among them.  Plaintiff's Ex. 7.

14. Because petitioner was unwilling to participate in a global settlement, the March 4,

2008 working draft proposal was never finalized by the defense lawyers or presented

to Lapham.

15. During the course of that spring, the attorney-client relationship began to deteriorate.

By June petitioner was refusing to meet with Tedmon for trial preparation purposes.

See Plaintiff's Ex. 8 (emails refusing meetings in June and July 2008).

16. In July, petitioner started refusing to cooperate with Pretrial Services.  See Plaintiff's

Ex. 9 (email from Tedmon to Kalfsbeek regarding supervision issues).

17. Kalfsbeek's written communications with Tedmon during this period were largely unintelligible due to petitioner's idiosyncratic use of pseudo-legal language and nonsensical financial and taxation concepts.  For example, in a July 2008 letter refusing a meeting and demanding documents, petitioner wrote:

> I cannot make it any plainer.  Please provide the tax return(s) to prove the fact of the claim(s), there is no fact until after tax. . . .
>
> The items (tax issues) we are talking about are gifts.  I am reporting the gifts.  Where are my checks(s) for my benefit? Failure to provide the check(s) must be federal withholding and I will go to the Internal Revenue Service, report the claim(s) made and the claimants failure to provide the accused, JAMES S. KALFSBEEK with a check(s) for tax recovery.

Plaintiff's Ex. 10.

18. Petitioner sent Mr. Tedmon copies of court documents and of Tedmon's letters to him, annotated with variations on the statement, "This is a gift.  Where is my check for my benefit?"  Plaintiff's Ex. 11, 12.

19. During the fall of 2008, Tedmon made repeated attempts to communicate meaningfully with petitioner about the case, but was rebuffed.  <u>See</u> Plaintiff's Ex. 13 (exchange of emails dated October 30, 2008 and November 3, 2008).

20. On February 5, 2009, Steve Lapham sent Tedmon an email indicating that he remained open to settlement.  Plaintiff's Ex. 14.  The message stated in relevant part: "With respect to the plea offer, I'm having a helluva time figuring out how to get the offer down low enough so that it might be palatable while at the same time not doing total violence to the guidelines.  If you have any ideas let me know.  As a last resort, I may just pick a sentence and say we would agree that it's justified under 3553 factors. I shall do a little more cogitating upon it."  <u>Id.</u>  Despite Lapham's use of the word "offer," no formal offer had ever been extended by the government and no specific proposal had been put forward by Mr. Tedmon due to petitioner's insistence on going to trial.  Lapham's message reflects a willingness to negotiate but does not establish that any concrete offer had been extended.

21. Also on February 5, 2009, Tedmon filed a status report.  Tedmon was concerned that

the attorney-client relationship had gone south, and that this might hurt Kalfsbeek at trial.  He did not know whether there was a lurking competency issue.  He decided to inform Judge Karlton of the problem and see what he wanted to do.  The status report, ECF No. 178, reported on the deterioration of the attorney-client relationship. Tedmon noted that communication had been excellent at the beginning, and that "I was able to discuss case options with Mr. Kalfsbeek, which included possible settlement offers from the government."  ECF No. 176; Plaintiff's Ex. 16, p. 3.  After the case failed to resolve and was set for trial, the relationship changed.  Tedmon detailed his difficulties communicating with petitioner, and requested a status conference.  ECF No. 176; Plaintiff's Ex. 16.

22. Tedmon's use of the phrase "possible settlement offers from the government" was somewhat imprecise.  There had been no concrete offers extended by the government. What he meant was "potential settlement ideas."

23. Tedmon provided a copy of the status report to petitioner, who returned it with the notation "This is a gift, where is my benefit[?]  Transfer Tax Certificate."[6]  Plaintiff's Ex. 16, p. 2.  Petitioner also emailed Tedmon, indicating that he had read the status report.  Plaintiff's Ex. 16, p. 1.  He asked no questions about the reference to prior settlement possibilities.[7]

24. Because Tedmon was unable to communicate effectively with petitioner at this time, and because petitioner had previously and emphatically rejected the idea of a plea agreement, Tedmon did not specifically convey to petitioner that Lapham had on February 5 reiterated his willingness to resolve the charges with a plea deal.

25. As the case moved toward trial, there was no discussion about a possible change of plea.  Tedmon was focused entirely on trying to gain petitioner's cooperation in

---

[6]  Petitioner put the same notation on Judge Karlton's Order setting a status conference, and filed it.  ECF No. 181.

[7]  The record reflects that a status conference was held on March 17, 2009, at which Judge Karlton ordered a psychiatric examination of petitioner.  ECF No. 183.  Following the examination, Judge Karlton ruled that petitioner was incapable of representing himself and that Mr. Tedmon would continue to represent him.  ECF No. 190.

preparing for trial, which was set for May 19, 2009.  Tedmon's efforts were met with a barrage of pseudo-legal gibberish.  See Plaintiff's Ex. 17-25 (emails dated March 2, 2009 through May 18, 2009).

26. On April 29, 2009, Tedmon informed petitioner that three of his co-defendants were considering plea offers.  Plaintiff's Ex. 22.  Petitioner asked no questions about this, and said nothing to indicate a change of heart about going to trial.  Tedmon did not specifically suggest that petitioner reconsider his position and entertain a plea offer.

27. The trial began on May 20, 2009.[8]

28. At no time prior to trial did prosecutor Lapham offer to recommend a 37 or 24 month sentence, or any other specific sentence, in exchange for petitioner's guilty plea.

29. At no time did Lapham indicate to Tedmon that he would be willing to resolve the charges for a stipulated sentence, or jointly recommended sentence, of 37 months or less.

30. At no time prior to trial did Tedmon make a specific proposal for a plea bargain to Lapham.  At no time did the defendants agree on proposed terms for a global settlement, or make such a proposal to Lapham.

31. Tedmon did convey to petitioner the proposal that was on the table among the defense lawyers in early March 2008, which included a proposed 24-month sentence for petitioner.  Petitioner rejected this idea.

32. Settlement discussions never progressed beyond the point of initial and tentative exploration of options, because petitioner made it clear that he would not join a global settlement.

33. After rejecting Tedmon's ideas about a plea deal, petitioner refused to meaningfully communicate with Tedmon until the trial began.

34. Kalfsbeek's testimony that he would have accepted a 37 month or 24 month offer prior to trial is not credible.  The undersigned does not doubt that petitioner sincerely

---

[8]  The tenor of the attorney-client relationship improved once trial was underway, and petitioner participated and communicated with Tedmon during the trial.

1    wishes that he had secured and accepted such an offer, but the evidence

2    overwhelmingly supports Tedmon's testimony that Kalfsbeek was unreceptive to any

3    consideration of a plea deal.  In light of petitioner's stance toward counsel and the case

4    in the year preceding trial, the undersigned finds that petitioner was not likely to have

5    accepted any plea offer.

6    IV.    Discussion

7        A.    Failure to Communicate Plea Offer

8        Because no specific plea offer was ever extended by the prosecutor, counsel cannot have

9    performed deficiently by failing to convey an offer.  The facts of this case do not support a claim

10   under Missouri v. Frye, which involved a favorable proposal that lapsed due to counsel's

11   unreasonable failure to relay its terms to the defendant.  Frye, 132 S.Ct. at 1408 ("This Court now

12   holds that, as a general rule, defense counsel has the duty to communicate formal offers from the

13   prosecution to accept a plea on terms and conditions that may be favorable to the accused.").  The

14   only thing that prosecutor Lapham ever conveyed to defense counsel Tedmon was a willingness

15   to seek mutually-agreeable terms.  That is not an offer within the meaning of Frye.  Lapham's

16   general willingness *was* conveyed to petitioner, who rejected the idea of a plea bargain.  These

17   facts do not come close to supporting a claim of ineffective assistance in plea negotiations.

18       Construed most favorably for petitioner, the evidence shows no more than counsel's

19   failure to persist in trying to persuade him to consider a plea bargain after March 17, 2008.

20   However, the lack of meaningful attorney-client communication from approximately May of

21   2008 to the beginning of the trial in May of 2009 is fully attributable to petitioner.  Moreover,

22   criminal defendants have no right to a plea bargain.  See Weatherford v. Bursey, 429 U.S. 545,

23   561 (1977).  Accordingly, counsel's failure to negotiate or secure an offer – even disregarding

24   petitioner's own role in the failure of plea discussions – deprived petitioner of nothing to which

25   he was entitled.

26       Finally, petitioner cannot establish prejudice from Tedmon's failure to obtain a favorable

27   offer.  First, the undersigned has found that petitioner would not have accepted a favorable plea

28   offer at the time one might have been available.  See Frye, 132 S.Ct. at 1409 (to prove prejudice,

14

1  petitioner must establish that a reasonable probability that he would have accepted offer).

2  Furthermore, the record is devoid of evidence to support a finding that Lapham would have

3  agreed to the terms that were under discussion among defense counsel in March of 2008.  See id.

4  (to prove prejudice, petitioner must also establish that prosecutor and court would have proceeded

5  with plea on proposed terms).

6      Because the evidence establishes neither deficient performance nor prejudice, this aspect

7  of petitioner's ineffective assistance of counsel claim should be denied.

8      B.  Failure To Object To Sovereign Citizen Evidence

9      Petitioner contends that Mr. Tedmon should have endeavored to keep evidence about the

10  sovereign citizen movement from the jury.  This aspect of the Strickland claim fails for two

11  related reasons: (1) such an objection or in limine motion was unlikely to succeed, and counsel

12  therefore cannot have performed deficiently in failing to bring it; and (2) the evidence was not

13  prejudicial.  Because this aspect of the ineffective assistance claim is refuted by the record, no

14  evidentiary hearing is necessary and summary denial is appropriate.

15      Prior to trial, the government indicated its intention to call an expert on the sovereign

16  citizen movement and like-minded extremist groups.  Petitioner's co-defendant Donna Rowe

17  moved to exclude such testimony.  ECF No. 210.  The government never presented the witness,

18  however.  Accordingly, this aspect of the Strickland claim appears to be directed at a risk of

19  prejudice that never materialized.  In any case, the fact that the district court denied defendant

20  Rowe's motion to exclude an expert on the sovereign citizenship movement, ECF No. 252,

21  indicates that a motion to exclude references to the sovereign citizen movement also would have

22  been denied.  There was no legal basis for granting such a motion, because use of the phrase

23  "sovereign citizen" could not be expected to unfairly influence the jury.  Jurors were highly

24  unlikely to have heard of the movement or to have negative preconceptions about it that would

25  have biased them against the defendants.

26      The case the government actually presented did not rely on identifying petitioner with the

27  sovereign citizen movement.  The prosecution did not present any evidence that petitioner

28  considered himself to be a sovereign citizen, or argue to the jury that they should draw any

1    specific inferences about his beliefs or affiliation.[9]  There was testimony that co-defendant Donna

2    Rowe considered herself to be a sovereign citizen. RT 879-81, 910-911 (testimony of Chris

3    Lewis).  Former PSASL member Dean Hamill testified that he joined PSASL because it was an

4    insurance system consistent with his sovereign citizen beliefs and his Christian faith.  RT 311-13.

5    Several other witnesses briefly mentioned that PSASL and its directors were influenced by anti-

6    government views or unconventional political ideas including sovereign citizenship.[10]  However,

7    the government made no arguments as to any defendant that sovereign citizen affiliation or

8    beliefs supported a finding of any fact necessary to the verdicts.  The government focused on the

9    nonsensical nature of the pseudo-legal language that the defendants used, and the invalidity of

10   their instruments, not on the particular ideological roots of the language or the instruments.  See

11   RT 1326-51 (testimony of law professor Francis J. Mootz).[11]

12          The witnesses' references to sovereign citizenship were collateral and not inflammatory.

13   There was no suggestion that the sovereign citizen movement or its adherents are dangerous in

14   any way.  Jurors may have formed the impression that sovereign citizen sympathizers are odd, but

15   nothing in the evidence supported adverse inferences that could have affected the verdict.

16   Moreover, the evidence as a whole included substantially more references to PSASL's overt

17   Christian identity and purported biblical basis than to sovereign citizen beliefs.  On this record,

18   counsel's failure to object to sovereign citizen evidence did not prejudice petitioner.

19          Indeed, much of what the jurors learned about sovereign citizen beliefs and PSASL's

20   conformity with those beliefs was elicited by defense counsel.  See, e.g., RT 342-51 (Mr.

21   _____

22   [9]  Mr. Lapham did assert in his opening statement that both defendants were sovereign citizens,
     and that sovereign citizen beliefs provide the context for understanding PSASL's pseudo-
23   insurance model.  RT 156-59, 181-83.  The prosecutor's arguments are discussed in more detail
     below, regarding the prosecutorial misconduct claim.
24   [10]  Former PSASL employee Sherryl Slack testified that most members were "anti-government
     religious fanatics," and that sovereign citizenship rhetoric was commonly heard around the office.
25   RT 224, 226-27.  Former member Daniel Gill testified that various individuals affiliated with
     PSASL expressed Christian and constitutional views about "sovereign . . . rights."  RT 647-48.
26   The references of these and other witnesses to sovereign citizenship were brief and not
     inflammatory.
27   [11]  Prof. Mootz was qualified as an expert in the fields of insurance and negotiable instruments.
     RT 1314.
28

1   Tedmon's cross-examination of Dean Hamill); RT 408 (Mr. Wiseman's cross-examination of

2   Camarie Hammill); RT 919-16 (Mr. Wiseman's cross-examination of Chris Lewis regarding

3   Donna Rowe's grand jury testimony).  This testimony supported the defense theories that PSASL

4   members were knowing and willing participants rather than victims, and that the defendants were

5   motivated by sincere if misguided convictions rather than intent to defraud.  Accordingly,

6   counsel's invitation of witness testimony regarding sovereign citizen ideas was neither

7   unreasonable nor prejudicial.

8        For all these reasons, this aspect of the <u>Strickland</u> claim fails on both performance and

9   prejudice grounds.

10        C.   <u>Failure To Object To Testimony That Petitioner Lied To The Court</u>

11        Petitioner contends that counsel performed deficiently by failing to object to testimony by

12   a witness that petitioner had lied in another judicial proceeding.  Petitioner describes the witness

13   as "an attorney for one of the Company's creditors."  ECF No. 432 at 14.

14        It appears that petitioner is referring to the testimony of Theodore Schlink, the attorney

15   who was retained to pursue recovery on the Michigan judgment obtained against PSASL in

16   relation to the claim involving PSASL member Wood.  That judgment was registered in the

17   Northern District of California, where petitioner was questioned by U.S. Magistrate Judge

18   Zimmerman in relation to a judgment debtor's examination conducted by Schlink.  At petitioner's

19   trial, Schlink testified that he had discovered shortly before the debtor's exam that PSASL had

20   funds in Canada that had been frozen.  RT 1131.  During the exam, petitioner claimed not to

21   know the name or address of the Canadian bank holding PSASL funds, the account number, or

22   anything about PSASL's operations in Canada.  RT 1132.  Judge Zimmerman ordered petitioner

23   to provide information regarding the Canadian accounts, and subsequently issued a Turnover

24   Order requiring petitioner to release the funds.  RT 1133-42.  Petitioner reported to Judge

25   Zimmerman on May 10, 2002, that he had instructed the Canadian bank to transfer the account

26   balance to the Colusa County Sheriff as ordered.  RT 1143-44.  Unbeknownst to Schlink and

27   Judge Zimmerman at the time, petitioner had moved the majority of PSASL funds out of the

28   Canadian bank into another PSASL-controlled account, and dispersed those funds, prior to

17

1  authorizing transfer of the Canadian bank balance to the Colusa County Sheriff.  RT 1144-45,

2  1180-81, 1190-92.  These events were the basis of Counts 31 through 34 (money laundering).

3        Mr. Schlink testified that the written interrogatories he propounded to petitioner during the

4  Northern District proceedings were returned to him stamped "Accepted for Value."  RT 1135,

5  1141.  Shortly before petitioner's trial, Schlink reviewed for the first time a copy of the same

6  document on which someone had written comments.  RT 1136-37.  California Department of

7  Insurance investigator Chris Lewis testified that the comments, which indicated proposed answers

8  to the interrogatories, were in Donna Rowe's handwriting.  RT 849, 842-55.[12]  Schlink testified

9  that petitioner had orally answered the interrogatories consistently with the notes.  RT 1138.

10  When asked what these responses told him as a person trying to collect a debt, Schlink answered:

11  "My first reaction was that I knew I had been deceived in this collection effort, and this was

12  evidence that someone was going to be deceiving me."  RT 1137.  When asked to characterize

13  other written remarks, Schlink stated, "Whoever wrote this, it appeared they were instructing

14  someone to deceive me. . . . That's how I took it."  RT 1138.  Schlink also testified that when he

15  and petitioner appeared in front of Judge Zimmerman regarding the turnover of funds, petitioner

16  never indicated that money had been removed from the Canadian account prior to the transfer.

17  RT 1150-51.

18        Nothing about Schlink's testimony was improper.  Petitioner's deceitful conduct in

19  transferring funds before honoring the Turnover Order was directly relevant to the money

20  laundering charges.  Petitioner's misleading or false statements in relation to the judgment debtor

21  exam were relevant to fraudulent intent.  Even if the references to intended deceit were subject to

22  objection, they were harmless.  In light of the evidence as a whole, this witness's characterization

23  of petitioner as deceitful can have had no conceivable influence on the verdict.  Accordingly, the

24  failure to object was neither unreasonable nor prejudicial.  The trial record refutes the claim,

25  which should be denied.

26  ////

27

28
_____
[12]  Lewis had seized the document containing Rowe's notes, along with other business records, from Rowe's residence pursuant to a search warrant.  RT 851.

D. <u>General Failure To Present A Defense</u>

The defense presented no evidence at trial.  Petitioner alleges in general terms that counsel performed deficiently by failing to research the law and investigate the facts of the case, and by failing to develop a defense strategy.  He does not propose any affirmative defense that was available to him but forfeited by counsel's failure to investigate.  He does not identify any witnesses or evidence that could and should have been presented on his behalf.  Accordingly, these allegations are inadequate to support relief.  <u>See</u> <u>James v. Borg</u>, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations of ineffective assistance which are unsupported by a statement of specific facts do not warrant habeas relief.") (citing <u>Boehme v. Maxwell</u>, 423 F.2d 1056, 1058 (9th Cir. 1970)); <u>see also</u> <u>United States v. Johnson</u>, 988 F.2d 941, 945 (9th Cir. 1993) (conclusory statements in a § 2255 motion are insufficient to require a hearing).  Absent a showing sufficient to establish prejudice, the claim may not proceed.  <u>See</u> <u>Hendricks v. Calderon</u>, 70 F.3d 1032, 1042 (1995) ("Absent an account of what beneficial evidence investigation into any of these issues would have turned up, [petitioner] cannot meet the prejudice prong of the <u>Strickland</u> test."); <u>Strickland</u>, 466 U.S. at 697 (if it is easiest to dispose of an ineffectiveness claim on the ground of lack of prejudice, that course should be followed).

This aspect of the ineffective assistance claim should be summarily denied.

PROSECUTORIAL MISCONDUCT

I.     <u>Petitioner's Allegations</u>

Petitioner contends that the prosecutor committed misconduct by introducing "irrelevant and inflammatory" sovereign citizen evidence, and making related arguments which "vilified Defendant before the trial judge and jury."  ECF No. 432 at 5.

II.    <u>Governing Legal Principles</u>

Prosecutorial misconduct does not, per se, violate a petitioner's constitutional rights.  <u>Jeffries v. Blodgett</u>, 5 F.3d 1180, 1191 (9th Cir. 1993) (citing <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986), <u>and</u> <u>Campbell v. Kincheloe</u>, 829 F.2d 1453, 1457 (9th Cir. 1987)).  Rather, claims of prosecutorial misconduct are reviewed "'on the merits, examining the entire proceedings to determine whether the prosecutor's [actions] so infected the trial with unfairness

19

1   as to make the resulting conviction a denial of due process.'"  Johnson v. Sublett, 63 F.3d 926,

2   929 (9th Cir. 1995); see also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974); Turner v

3   Calderon, 281 F.3d 851, 868 (9th Cir. 2002).  Relief is limited to cases in which the petitioner can

4   establish that prosecutorial misconduct resulted in actual prejudice.  Johnson, 63 F.3d at 930.

5        A prosecutor's improper statements violate the constitution only where they "so infect[]

6   the trial with unfairness as to make the resulting conviction a denial of due process."  Darden v.

7   Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643

8   (1974) (internal quotation marks omitted)).  It is not enough that the remarks were "undesirable or

9   even universally condemned."  Darden, 477 U.S. at 181.  Fundamental fairness must be assessed

10  in context of the trial as a whole, including the weight of the evidence, the defense opportunity to

11  respond, and the instructions given to the jury.  Id. at 181-82.

12      III.    Discussion

13       This claim is subject to summary dismissal.  Petitioner identifies no particular

14  inflammatory or "vilifying" statements made by the prosecutor in argument.  The undersigned has

15  reviewed the transcripts and finds no objectionable statements, let alone any statements that rise

16  to the level of due process violations.

17       To the limited extent that sovereign citizen evidence was presented at trial, as previously

18  discussed, that evidence was neither inflammatory nor likely to prejudicially affect the verdict.

19  Because testimonial references to the sovereign citizen movement were collateral and not

20  inflammatory, this claim is refuted by the record insofar as it is based on the government's

21  presentation of evidence.

22       The claim is also refuted by the record insofar as it challenges the statements of Messrs.

23  Lapham and Carlsberg in argument.  Mr. Lapham's opening statement told the jury that "the

24  defendants consider themselves to be sovereign citizens, people who reject the authority of the

25  government to set rules and regulations for them."  RT 156.  This is a neutral statement of fact.

26  Lapham's brief introductory explanation of the sovereign citizen concept, RT 157-59, was not

27  inflammatory; it merely gave jurors a context for interpreting otherwise confusing language that

28  the defendants had used in relation to PSASL and that jurors would therefore hear during the

1    course of the trial.  See also RT 181-83.

2           Mr. Carlsberg began the government's closing argument by telling the jury, "This is a

3    case about fraud.  It's not a case about sovereign citizens.  It's not a case about Christianity.  It's a

4    case about fraud."  RT 1378-79.  There were no further references to sovereign citizenship in Mr.

5    Carlsberg's lengthy argument.

6           In rebuttal, Mr. Lapham argued that the defendants' sovereign citizen beliefs were

7    "marginally relevant to this case" because they demonstrate that the defendants "simply don't

8    believe that the law applies to them.  They want to create a system outside of our system of laws."

9    RT 1469.  This was permissible argument, not misconduct.

10          None of the fleeting references to sovereign citizenship in the prosecutors' statements to

11   the jury improperly "vilified" petitioner or had any conceivable prejudicial effect.  This claim

12   should be summarily denied.

13                         INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

14   I.      Petitioner's Allegations

15          Petitioner contends that appellate counsel provided ineffective assistance by failing to

16   raise the issues of ineffective assistance of trial counsel and prosecutorial misconduct.  ECF No.

17   432 at 7.

18   II.     Governing Legal Principles

19          A criminal defendant enjoys the right to effective assistance of counsel on appeal.  Evitts

20   v. Lucey, 469 U.S. 387, 391 (1985).  The Strickland framework applies to claims that this right

21   has been violated.  Smith v. Robbins, 528 U.S. 259, 285 (2000).  To demonstrate prejudice,

22   petitioner must show a reasonable probability that he would have prevailed on appeal absent

23   counsel's errors.  Id. at 285-86.

24   III.    Discussion

25          Because petitioner's claims of ineffective assistance at trial and of prosecutorial

26   misconduct are meritless for the reasons previously explained, appellate counsel was not

27   ineffective in failing to raise them.  See Smith v. Murray, 477 U.S. 527, 536 (1986) (winnowing

28   out weak arguments on appeal is hallmark of effective advocacy, not indicator of ineffectiveness).

1    Accordingly, this claim should be summarily denied.

2                                    CONCLUSION

3           For all the reasons set forth above, IT IS RECOMMENDED that petitioner's motion

4    under 28 U.S.C. § 2255, ECF No. 432, be DENIED.

5           These findings and recommendations are submitted to the United States District Judge

6    assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within fourteen days

7    after being served with these findings and recommendations, any party may file written

8    objections with the court and serve a copy on all parties.  Such a document should be captioned

9    "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

10   shall be served and filed within fourteen days after service of the objections.  The parties are

11   advised that failure to file objections within the specified time may waive the right to appeal the

12   District Courts order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

13   DATED: March 26, 2015

14                                        _____
                                          ALLISON CLAIRE
15                                        UNITED STATES MAGISTRATE JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28

                                              22